714 A.2d 351

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ALVARO ROLDAN, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 27, 1997—Decided July 30, 1998.

Before Judges PETRELLA, SKILLMAN and EICHEN.

*Ivelisse Torres*, Public Defender, attorney for appellant (*Steven M. Gilson*, Designated Counsel, of counsel and on the brief).

*Peter Verniero*, Attorney General, attorney for respondent (*Carol M. Henderson*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D.

This appeal requires us to address issues regarding vicarious liability for the possession of drugs which the Court left unresolved in *State v. Schmidt*, 110 *N.J.* 258, 540 *A.*2d 1256 (1988).

A jury found defendant guilty of conspiracy to commit the offenses of distribution of cocaine, possession of cocaine with the intent to distribute and possession of cocaine, in violation of *N.J.S.A.* 2C:5–2; first degree possession of cocaine with the intent to distribute, in violation of *N.J.S.A.* 2C:35–5; and third degree possession of cocaine, in violation of *N.J.S.A.* 2C:35–10. The court sentenced defendant to a twenty-year term of imprisonment, with ten years of parole ineligibility, for possession of cocaine with the intent to distribute. The court also imposed the statutorily mandated penalties and fees. The court merged defendant's other convictions into his conviction for possession of cocaine with the intent to distribute.

Defendant's convictions were based on the following evidence. In late August 1994, Jesus Morales agreed with Leonardo Paredes to transport 320 kilograms (700 pounds) of cocaine from Arizona to New Jersey in a mini-van. Paredes promised to pay Morales $240,000 for transporting the drugs, which he was to receive from the purchasers upon delivery. Paredes gave Morales a pager number to call when he arrived in New Jersey, telling him he would be contacted by a Columbian named Jose Wells. When Morales arrived in New Jersey, he obtained a room at a Days Inn in Newark and called the pager number. After waiting two days without being contacted, Morales became concerned that the purchasers might have a plan to steal the drugs and moved to a Ramada Inn. At this point, the State Police received a tip from a confidential informant that there was some drug related activity going on at the Ramada. Consequently, Detective Fernando Pineiro went to the Ramada, where he noticed Morales behaving suspiciously. On September 3, 1994, Pineiro confronted Morales and, after Pineiro informed Morales that some of his responses to questions were inconsistent with information the State Police had obtained in their investigation, Morales consented to a search of the mini-van, which resulted in the discovery of the cocaine. All of the cocaine was taken to State Police headquarters where it remained for the duration of the investigation. At this time, Morales agreed to cooperate with the State Police and continue

with the planned drug transaction while allowing Pineiro to pose as his son-in-law.

Later that evening, Morales received a telephone call from defendant concerning the delivery of the cocaine. Morales said that he would not deliver the cocaine until he received his $240,000 fee. Defendant called back a short while later and said he had spoken to his "papa," meaning his supervisor, and that he would be at Morales' motel room early the next morning. Negotiations with defendant continued the next day, with Morales insisting on receiving payment for transporting the cocaine before making delivery. Morales then received several telephone calls from a person who identified himself as Jose Wells, who indicated that their bosses had changed the arrangements for the delivery of the cocaine and that Morales should "contact [his] Papa." Following this conversation, Morales received a call from Paredes, who told him to make immediate delivery of the cocaine, and that Paredes would pay him directly after he returned to Arizona. During this conversation, Paredes also told Morales that he had a commitment to sell a total of 600 kilograms of cocaine to the persons to whom the cocaine was to be delivered.

When defendant called the room a few minutes later, Morales told him he would follow Paredes' instructions and deliver the cocaine without receiving payment of his fee. Defendant arrived at the motel shortly thereafter where he met an individual subsequently identified as Omar Arayo. The two men started walking towards the motel but then quickly returned to their car. At this point, the police arrested both defendant and Arayo.

At trial, defendant did not present any evidence in his own behalf. During summation, defense counsel argued that the evidence indicated defendant had not conspired to distribute the cocaine but had been merely a prospective buyer. Defense counsel also argued that because neither money nor drugs changed hands, defendant never had possession of the cocaine.

After the jury returned verdicts of guilty as to all charges, defendant filed a motion for a new trial on the ground that the

verdict was against the weight of the evidence. The court denied this motion, finding that there was sufficient evidence to support the convictions.

On appeal, defendant argues that because a civil forfeiture of money allegedly belonging to defendant was imposed in connection with this case, his criminal conviction violated the Double Jeopardy Clauses of the United States and New Jersey Constitutions; that the trial court should have granted a judgment of acquittal because the State failed to present the evidence required to support a finding of guilt or, in the alternative, the court should have granted his motion for a new trial because the verdict was against the weight of the evidence; and that the trial court failed to adequately evaluate the applicable aggravating and mitigating factors in imposing sentence. In addition, defendant filed a supplemental pro se brief in which he argues that the police violated his Fourth Amendment rights in a search of his house and automobile and a search of his person incident to his arrest and that his arrest was the result of police entrapment.

We conclude that the State's evidence was sufficient to support defendant's conviction for conspiracy. However, the State's evidence did not provide a basis for his convictions for possession of cocaine and possession of cocaine with the intent to distribute under either of the theories under which the case was submitted to the jury. Because the evidence would have supported defendant's convictions under an alternative theory that was not submitted to the jury, we reverse the convictions for possession of cocaine and possession of cocaine with the intent to distribute and remand the case for a new trial. Defendant's other arguments are clearly without merit and do not require discussion. R. 2:11-3(e)(2). Consequently, if defendant is acquitted of the possessory offenses at a retrial, the trial court should impose sentence for the conspiracy conviction.

I

Initially, we consider the conspiracy conviction. The Code of Criminal Justice provides:

A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

[*N.J.S.A.* 2C:5–2a.]

In addition, the Code provides that "[i]f a person guilty of conspiracy ... knows that a person with whom he conspires to commit a crime has conspired with another person or persons to commit the same crime, he is guilty of conspiring with such other person or persons, whether or not he knows their identity." *N.J.S.A.* 2C:5–2b. Thus, as under pre-Code law, "[i]t may be that the alleged conspirators have never seen each other, and have never corresponded. One may have never heard the name of the other, and yet by the law they may be parties to the same common criminal agreement." *State v. Carbone,* 10 *N.J.* 329, 338, 91 *A.*2d 571 (1952) (quoting *R. v. Parnell,* 14 *Cox Cr. Cases* 508, 515 (1881)); *accord State v. Ball,* 141 *N.J.* 142, 178–79, 661 *A.*2d 251 (1995), *cert. denied,* 516 *U.S.* 1075, 116 *S.Ct.* 779, 133 *L.Ed.*2d 731 (1996).

Moreover, *N.J.S.A.* 2C:5–3a provides in pertinent part that "it is immaterial to the liability of a person who conspires with another to commit a crime that (1) ... the person with whom he conspires does not occupy a particular position or have a particular characteristic which is an element of such crime, if [the alleged conspirator] believes that [the purported co-conspirator] does; or (2)[t]he person with whom he conspires ... has an immunity to prosecution or conviction for the commission of the crime." This definition "departs from the traditional notion of conspiracy as an entirely bilateral or multilateral relationship.... Attention is directed instead to each individual's culpability by framing the definition in terms of the conduct that suffices to establish the liability of any given actor, rather than the conduct of a group of which he is charged to be a part—an approach that the Drafters of the [Model Penal] Code designate as 'unilateral.' " *State v. Del Fino,* 100 *N.J.* 154, 160, 495 *A.*2d 60 (1985). Under this unilateral

approach to conspiratorial liability, a person may be guilty of conspiracy even though the other party to the criminal agreement is an undercover police officer or police informant who has no intention of actually committing a crime. As explained in the Code Commentary:

> [The accused] has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by the other's secret intention. True enough, the project's chances of success have not been increased by the agreement; indeed, its doom may have been sealed by this turn of events. But the major basis of conspiratorial liability—the unequivocal evidence of a firm purpose to commit a crime—remains the same.
>
> [*Model Penal Code* § 5.03 comment 2 (Tentative Draft No. 10 (1960)).]

■ In *State v. Conway*, 193 *N.J.Super.* 133, 159, 472 *A.*2d 588 (App.Div.), *certif. denied,* 97 *N.J.* 650, 483 *A.*2d 174 (1984), we concluded that while pre-Code law under Title 2A "required an agreement between two guilty conspirators to have a conspiracy[,] . . . Title 2C . . . recognizes unilateral conspiracies." Consequently, "undercover agents can be conspirators for the purpose of proving that a conspiracy existed." *Id.* at 159–60, 472 *A.*2d 588. The Supreme Court has also indicated in dictum that the Code reflects the unilateral approach to conspiratorial liability. *Del Fino, supra,* 100 *N.J.* at 160, 495 *A.*2d 60; *see also State v. Grey,* 147 *N.J.* 4, 32, 685 *A.*2d 923 (1996) (Coleman, J., concurring and dissenting).[1]

■ The conspiracy alleged in this case was what is commonly referred to as a chain conspiracy. In such a conspiracy "there is successive communication and cooperation between A and B, B and C, C and D, and so on." *New Jersey Penal Code,* Volume II: Commentary, Final Report of the New Jersey Criminal Law

---

[1] We note that the federal courts adhere to the bilateral approach to conspiracy liability, and the general rule in federal cases is that there can be no conspiracy when the only other co-conspirator is a government informer. *See, e.g., United States v. Duff,* 76 *F.*3d 122, 127 (7th Cir.), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 148, 136 *L. Ed.*2d 94 (1996); *United States v. Rosenblatt,* 554 *F.*2d 36 (2nd Cir.1977).

Revision Commission, comment 13 on *N.J.S.A.* 2C:5–2 (1971). "Under the chain analysis, the government need not prove a direct connection between all the conspirators." *United States v. Tarantino,* 846 *F.*2d 1384, 1392 (D.C.Cir.), *cert. denied,* 488 *U.S.* 867, 109 *S.Ct.* 174, 102 *L.Ed.*2d 143 (1988). "[T]he liability of members of the distribution chain is predicated upon the notion that participants at different levels in the chain know that the success of those at each level hinges upon the success of the others and therefore cooperate for their mutual benefit." *United States v. Townsend,* 924 *F.*2d 1385, 1391 (7th Cir.1991); *see generally* Wayne R. LaFave and Austin W. Scott, Jr., 2 *Substantive Criminal Law,* § 6.5d(2) (1986).

▇▇▇ Such a drug distribution conspiracy falls outside of the general rule that a simple agreement to buy drugs is insufficient to establish a conspiracy between the seller and the buyer. *See United States v. West,* 15 *F.*3d 119, 121 (8th Cir.), *cert. denied,* 513 *U.S.* 863, 115 *S.Ct.* 177, 130 *L.Ed.*2d 112 (1994); *United States v. Mancillas,* 580 *F.*2d 1301, 1307 (7th Cir.), *cert. denied,* 439 *U.S.* 958, 99 *S.Ct.* 361, 58 *L.Ed.*2d 351 (1978); *Hernandez v. State,* 182 *Ga.App.* 797, 357 *S.E.*2d 131, 134 (1987); *McBride v. State,* 440 *N.E.*2d 1135, 1137 (Ind.App.1982). The essential rationale of the general rule, commonly referred to as Wharton's rule, is that where an agreement between two parties is inevitably incident to the commission of a crime, such as a sale of contraband, "conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained." *Iannelli v. United States,* 420 *U.S.* 770, 773, 95 *S.Ct.* 1284, 1288, 43 *L.Ed.*2d 616, 620 (1975) (quoting 2 F. Wharton, *Criminal Law* § 1604, p. 1862 (12th ed.1932)).[2] However, when the evidence shows that two or more parties have entered into an agreement to engage in concerted criminal activity which goes beyond the kind of simple agreement inevitably inci-

---

[2] Classic examples of Wharton's rule offenses are: dueling, bigamy, adultery, pandering, gambling, buying and selling contraband goods, giving and receiving bribes. LaFave and Scott, *supra,* 2 *Substantive Criminal Law* § 6.5(g)(4).

dent to the sale of contraband and consequently "makes possible the attainment of ends more complex than those which one criminal could accomplish," *Iannelli, supra,* 420 *U.S.* at 778, 95 *S.Ct.* at 1290, 43 *L.Ed.*2d at 623 (quoting *Callanan v. United States,* 364 *U.S.* 587, 593–94, 81 *S.Ct.* 321, 325, 5 *L.Ed.*2d 312, 317 (1961)), the participants may be found guilty of conspiracy. *United States v. Edwards,* 36 *F.*3d 639, 643 (7th Cir.1994); *Mancillas, supra,* 580 *F.*2d at 1307.

The federal courts have identified various factors which may support the conclusion that a defendant was a participant in a drug distribution conspiracy rather than simply a seller or buyer in an isolated drug transaction. For example, "evidence of transactions done on a consignment or credit basis may . . . give rise to an inference of [a conspiracy because such an arrangement shows] a level of cooperation and trust not typically found absent some type of agreement." *Edwards, supra,* 36 *F.*3d at 643. Another indication of a conspiracy is "a pattern of frequent and repeated transactions" between the participants. *Ibid.* The amount of drugs involved in a transaction also may give rise to an inference that each of the participants had to have been aware "he was 'a part of a venture which extended beyond his individual participation.'" *United States v. Prieskorn,* 658 *F.*2d 631, 635 (8th Cir.1981) (quoting *United States v. Magnano,* 543 *F.*2d 431, 434 (2nd Cir.1976), *cert. denied,* 429 *U.S.* 1091, 97 *S.Ct.* 1101, 51 *L.Ed.*2d 536 (1977)). "Conspiracies, like all business ventures, are typically distinguished [from simple agreements to buy criminal contraband] by cooperative relationships between the parties that facilitate achievement of the goal." *Townsend, supra,* 924 *F.*2d at 1395.

Applying these principles, there was clearly sufficient evidence for the jury to find that Paredes conspired with Wells or defendant's other superiors to ship cocaine from Arizona to New Jersey for subsequent distribution to retail sellers, and that Morales and defendant agreed to participate in this drug distribution scheme. The State's evidence showed that even before Morales left Arizona, Paredes entered into an agreement with

defendant's superiors concerning the amount of the drugs to be brought to New Jersey (320 kilograms), the manner in which Morales would contact Wells upon his arrival in New Jersey (by placing a telephone call to a particular pager number), and the amount that would be paid to Morales for transporting the drugs ($240,000). The State's evidence also indicated that Paredes had made "a commitment" to sell defendant's superiors an additional 280 kilograms of cocaine. Another indication of the complexity of this drug distribution scheme, and of the mutual dependence of the participants, is that Paredes instructed Morales to transfer possession of the cocaine without receiving payment in cash.[3] Thus, it must be inferred that defendant's superiors either already had paid for the drugs or had some form of consignment or credit arrangement with Paredes. Moreover, in view of the quantity of drugs involved, defendant and every other participant in the transaction had to have been aware that Wells or his superiors and others further down the distribution chain would engage in additional bulk sales before the ultimate retail sales to drug users. Consequently, the State's evidence showed that defendant was not simply a drug purchaser but rather a participant in a complex agreement to facilitate the interstate transportation and distribution of a very substantial amount of drugs. Therefore, we affirm defendant's conviction for conspiracy.

## II

We turn next to defendant's argument that the State failed to present evidence from which a jury could find him guilty of possession of cocaine and possession of cocaine with the intent to distribute. Because Morales never delivered the cocaine to defendant, there was no evidence that defendant had actual possession of the cocaine. Therefore, defendant's conviction for the possession charges can be sustained only if the evidence supports a

---

[3] Although the original arrangement had been that Wells would pay Morales' $240,000 courier fee, Morales was never instructed to receive payment for the drugs.

finding that defendant either had constructive possession of the cocaine or was vicariously liable as an accomplice or co-conspirator.

The leading New Jersey case dealing with this subject is *State v. Schmidt, supra,* 110 *N.J.* 258, 540 *A.2d* 1256. Schmidt was a Florida drug dealer who offered a courier $1,500 to transport a package of cocaine from Tampa, Florida, to a confederate in Long Island. The courier was stopped for speeding on the New Jersey Turnpike, which resulted in the discovery and seizure of the cocaine. At this point, the courier agreed to cooperate with the State Police and at their direction he called Schmidt at the Long Island residence to which he was supposed to deliver the drugs. The courier told Schmidt he was stopped at a service area because of car problems. Schmidt drove to the service area, and the State Police arrested him as he began to remove luggage from the courier's car. Schmidt was subsequently charged with conspiracy to distribute cocaine and various counts of possession and possession with the intent to distribute the cocaine. At trial, the State's sole theory in support of the possession charges was that Schmidt had constructive possession of the cocaine while his courier transported the drugs through New Jersey. A jury found him guilty of all charges.

On appeal, Schmidt argued that there was insufficient evidence that he had the requisite dominion and control over the cocaine to support his conviction on a theory of constructive possession. *State v. Schmidt,* 213 *N.J.Super.* 576, 584–85, 517 *A.2d* 1226 (App.Div.1986). However, we affirmed the convictions without considering whether the evidence was sufficient to support a finding of constructive possession, concluding that because Schmidt had been found guilty of conspiring with the courier to distribute the cocaine, he was vicariously responsible for the courier's actual possession. *Id.* at 586, 517 *A.2d* 1226.

The Supreme Court held that Schmidt's convictions for the possession offenses could not be sustained on a theory of vicarious responsibility for the conduct of a co-conspirator because that theory had not been presented to the jury:

We cannot affirm a criminal conviction on the basis of a theory not presented to the jury. To do so would trench on a defendant's sixth amendment guarantee, incorporated as well in our State Constitution, of trial by jury.

. . . .

Since this jury did not find vicarious guilt under the theory of conspiracy, that theory cannot sustain its verdict of guilt of possession.

[110 *N.J.* at 264–66, 540 *A.*2d 1256 (citations omitted).]

*Accord State v. Grey, supra,* 147 *N.J.* at 15–16, 685 *A.*2d 923; *State v. Mann,* 244 *N.J.Super.* 622, 628–29, 583 *A.*2d 372 (App.Div. 1990). The Court then considered whether defendant's convictions could be sustained on the theory of constructive possession under which the case had been submitted to the jury. The Court noted that constructive possession usually involves a showing of "ownership, dominion or control" over either the contraband itself or over the premises or vehicle containing the contraband. *Schmidt, supra,* 110 *N.J.* at 269, 540 *A.*2d 1256. Although a defendant need not have the drugs literally in his hands, he must have the "recognized authority in his criminal milieu" to possess them. *Ibid.* (quoting *United States v. Manzella,* 791 *F.*2d 1263, 1266 (7th Cir.1986)). However, because the State Police had already removed the cocaine from the courier's car before Schmidt arrived at the turnpike service area, the State could not show that Schmidt was ever "able to assert direct control over [the cocaine]." *Id.* at 271, 540 *A.*2d 1256. The Court also rejected the State's contention that Schmidt could be found to have constructively possessed the cocaine based on the "co-conspirator's control," *ibid.,* concluding that the conspiracy between Schmidt and the courier "did not evidence [defendant's] capacity to control the goods" while they were in the courier's possession. *Id.* at 272, 540 *A.*2d 1256.

In the present case, the charges of possession of cocaine and possession of cocaine with the intent to distribute were submitted to the jury under two theories: first, that defendant had constructive possession of the drugs brought into New Jersey by Morales, and secondly, that defendant was vicariously liable as an accomplice for Morales' possession. However, the court did not ask the jury to return separate verdicts. Consequently, unless the State presented sufficient evidence to support a guilty verdict under

both theories, defendant's conviction must be reversed.[4]  *See State v. Harris*, 141 *N.J.* 525, 562, 662 *A.*2d 333 (1995) (a general verdict of guilty cannot stand if the court submitted the case on two or more theories, one of which was insufficient); *cf. Schmidt, supra*, 110 *N.J.* at 265, 540 *A.*2d 1256 ("[T]he question is not whether a *theory* of guilt may be spelt out of a record, but whether guilt on that theory has been found by a jury.").

It is even clearer in this case than in *Schmidt* that defendant never had constructive possession of the cocaine brought into New Jersey.  Before defendant met or even had any telephone communication with Morales, the State had arrested Morales and confiscated the cocaine.  Moreover, defendant's subsequent contentious negotiations with Morales concerning the delivery of the cocaine clearly indicate he had no control over Morales, much less the kind of direct dominion and control over the cocaine required to establish constructive possession under *Schmidt*.[5]  Therefore, defendant's convictions for possession of cocaine and possession of cocaine with the intent to distribute must be reversed.

### III

Finally, we consider whether the evidence would support a finding that defendant was vicariously liable as an accomplice or co-conspirator for the possessory offenses and consequently

---

[4] Although defendant's convictions for the possessory offenses would have to be reversed even if the only deficiency in the State's proofs was the failure to present evidence that would support a finding that defendant had constructive possession of the cocaine, we conclude for the reasons set forth on pp. 189–90, 714 *A.*2d at 359–60 of this opinion that the State's evidence was also insufficient to support a conviction under the alternative theory of vicarious accomplice liability.

[5] If any of the other participants in the drug distribution scheme had constructive possession of the cocaine, it would have been Paredes, who hired Morales to transport the cocaine to New Jersey and who gave him directions during his negotiations with defendant.  However, the similarity between Paredes' role in the drug distribution scheme in this case and Schmidt's control over his drug courier which the Court found insufficient to establish constructive possession in *Schmidt* suggests that there would be a serious question whether even Paredes could have been found guilty of a possessory offense.

whether the State may retry him under either or both of those theories of criminal liability.

*N.J.S.A.* 2C:2–6b(4) provides that "[a] person is legally accountable for the conduct of another person when ... [h]e is engaged in a conspiracy with such other person." Under this statute, a conspirator is responsible for all criminal acts committed in furtherance of the conspiracy. *State v. Bridges,* 133 *N.J.* 447, 454, 628 *A.*2d 270 (1993). "[T]he acts of one conspirator in furtherance of the conspiracy are deemed to be the acts of all of the co-conspirators under a mutual-agency theory." *Id.* at 454–55, 628 *A.*2d 270.

As discussed at length in section I of this opinion, the evidence is sufficient to support a finding that defendant and Morales were both participants in a drug trafficking conspiracy. The evidence is also sufficient to support a finding that defendant was a participant in the conspiracy while Morales was in possession of the cocaine. The fact that defendant responded when Morales called the pager telephone number Paredes had given him would support an inference that defendant was involved in the conspiracy prior to Morales' arrest. Moreover, it seems improbable that Wells would have entrusted a person who had joined the conspiracy only a few hours earlier to handle a drug transaction of this magnitude. Therefore, the State presented sufficient evidence from which a jury could find defendant vicariously liable as a co-conspirator for Morales' possession of cocaine and possession of cocaine with the intent to distribute.

This conclusion is supported by our decision in *Schmidt,* in which we held that Schmidt could be found vicariously liable as a conspirator for his courier's possession of cocaine. *Schmidt, supra,* 213 *N.J.Super.* at 586, 517 *A.*2d 1226. Although the Supreme Court reversed our affirmance of Schmidt's convictions for the drug possessory offenses because the theory of conspiratorial vicarious liability had not been submitted to the jury, it did not express any disagreement with our conclusion that the evidence would have been sufficient to support the convictions under this theory.

The subject of vicarious accomplice liability is governed by different sections of the Code than vicarious conspiratorial liability and consequently must be separately analyzed. *N.J.S.A.* 2C:2–6(b)(3) provides that "[a] person is legally accountable for the conduct of another person when ... [h]e is an accomplice of such other person in the commission of an offense." Under *N.J.S.A.* 2C:2–6c(1)(a) and (b), an accomplice is a person who, with the purpose of promoting or facilitating another person in the commission of an offense, aids or agrees or attempts to aid the other person in planning or committing the offense or solicits the other person to commit the offense. Thus, to be found guilty under a theory of accomplice liability, a defendant must not only have the purpose of promoting or facilitating the commission of a crime but also must have "at least indirectly participated in the commission of the criminal act." *State v. Fair*, 45 *N.J.* 77, 95, 211 *A.2d* 359 (1965); *accord State v. Williams*, 263 *N.J.Super.* 620, 631, 623 *A.2d* 800 (App.Div.), *certif. denied*, 134 *N.J.* 477, 634 *A.2d* 524 (1993). In other words, even though a defendant may be found guilty under a theory of conspiratorial liability based solely on an agreement to commit a crime,[6] *see State v. Conway, supra,* 193 *N.J.Super.* at 159–60, 472 *A.2d* 588, a defendant must be shown to have engaged in conduct designed to aid another in the commission of a crime to be found guilty under a theory of accomplice liability, *see State v. Norman*, 151 *N.J.* 5, 32, 697 *A.2d* 511 (1997).

The State failed to present evidence of any conduct by defendant which was designed to aid Morales in his possession of the cocaine. When defendant first contacted him, Morales no longer had possession of the cocaine because it already had been

---

6 Under *N.J.S.A.* 2C:5–2(d), the State is not required to show any overt act if an alleged conspiracy involves a crime of the first or second degree or the distribution or possession with the intent to distribute a controlled dangerous substance. Consequently, the State was not required to show any overt act for defendant to be found guilty of second degree conspiracy to commit the offenses of distribution of cocaine and possession of cocaine with the intent to distribute.

seized by the State Police. Moreover, the State did not present any evidence that defendant had taken any steps to facilitate Morales' transportation of the cocaine into New Jersey, such as by renting the van or reserving the motel room for him. Therefore, defendant cannot be found guilty of possession of cocaine or possession of cocaine with the intent to distribute under a theory of accomplice liability, because all of his activities in furtherance of the drug conspiracy occurred after Morales' criminal possession of the cocaine had ended as a result of its seizure by the State Police. *See United States v. Camargo–Vergara*, 57 *F*.3d 993, 1001 (11th Cir.1995) ("A person cannot aid and abet a crime that has already been completed.").

Accordingly, defendant's convictions for possession of cocaine and possession of cocaine with the intent to distribute are reversed and the case is remanded to the trial court for a retrial of the possessory offenses limited to a theory of vicarious conspiratorial liability. Defendant's conviction for conspiracy is affirmed. Consequently, if defendant is acquitted of the possessory offenses at his retrial, the conspiracy conviction would be unmerged, *see State v. Pennington*, 273 *N.J.Super.* 289, 295–96, 641 *A*.2d 1085 (App. Div.), *certif. denied*, 137 *N.J.* 313, 645 *A*.2d 141 (1994), and the court should impose sentence for that conviction.