**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1475-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RASHAWN BOND,
a/k/a RASHAWN BILLUPS,

    Defendant-Appellant.

_____

Argued January 16, 2024 – Decided January 26, 2024

Before Judges Mawla, Chase, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-03-0288.

Roy B. Greenman argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Roy B. Greenman, Designated Counsel, on the briefs).

Milton Samuel Leibowitz, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Milton Samuel Leibowitz, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Rashawn Bond appeals from a December 15, 2021 order denying his motion for a new trial on grounds of alleged Brady[1] violations by the State. We affirm.

The parties are familiar with the facts, which we need not recite in detail here, and which were described in our prior opinions, including: State v. Bond (Bond I), No. A-2317-14 (App. Div. Oct. 18, 2017) (slip op. at 18), where we affirmed defendant's convictions and remanded for resentencing; and State v. Bond (Bond II), No. A-3597-18 (App. Div. May 27, 2021) (slip op. at 29), in which we affirmed in part and remanded in part the trial court's denial of defendant's motion for a new trial that asserted Brady violations. However, to summarize,

> defendant, Jamel Lewis, Robert Harris, Titus Lowery, and Sharif Torres planned to rob Raheem Jackson, who was a drug dealer and the boyfriend of Tanya Worthy. They planned to stage a robbery and kidnap Worthy while she was with defendant.
>
> On the evening of October 28, 2008, Worthy ordered dinner at a restaurant in Newark, and afterwards she went to defendant's home. Lewis, Harris, Torres, and Lowery arrived there. They pretended to rob defendant and then kidnapped Worthy.

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

Lewis and Lowery drove Worthy to Jackson's home in Green Brook. Defendant was supposed to follow them. He borrowed a car from his girlfriend, Jasmine Campbell. Defendant, Harris, and Torres drove to Green Brook.

Lewis and Lowery arrived at Jackson's home. When Jackson opened the door to his garage, he saw a masked man with a gun exit Worthy's car. The man told Jackson not to move. Jackson closed and locked the garage door.

Defendant and the other perpetrators left Jackson's home. Defendant drove to Elizabeth, where Worthy's car was set on fire. She was in the back seat. She had previously been shot and killed. Defendant then traveled back to Newark, went to his girlfriend's home, returned her car, and handed her a Gucci handbag that belonged to Worthy.

[Bond II, slip op. at 2-3.]

A jury convicted defendant of kidnapping, robbery, felony murder, and receiving stolen property. Id. at 8-9.

In Bond II, we remanded and directed the trial court to explore letters written by Shawn Williams, a cooperating State's witness, to: Detective Joe Vendas, the lead investigator in defendant's case; an investigator in the Union County jail in gang intelligence; and the prosecutor trying defendant's case. Id. at 3. The letters discussed Williams's cooperation with federal law enforcement in the prosecution of cases against the South Side Cartel (SSC) and MS-13

gangs, and Lewis's contact with Williams telling him to retract his statements implicating Lewis and defendant in the underlying crimes. Id. at 3-4. Central to the defense trial strategy was the claim that Lewis was a member of the SSC, had masterminded the scheme to rob Jackson, and defendant cooperated out of duress because Lewis had killed defendant's brother and would do the same to him if he did not cooperate. Ibid.

Defendant argued the failure to produce Detective Vendas's notes, Williams's letters, and Williams's federal grand jury testimony constituted discovery violations, which warranted a new trial. Id. at 24. We rejected defendant's arguments except for those related to the letters. Id. at 24-27. We remanded because the trial court made no findings about whether the State committed Brady violations by failing to provide all of Williams's letters in discovery. Id. at 28-29.

On remand, defendant reiterated his claim Williams's letters and cooperation in federal gang cases should have been disclosed because it was central to his duress defense. He argued the letters were critical to impeach Williams's testimony that Lewis asked to steal a car to use in the robbery and said defendant would pay him for the vehicle because this testimony implicated

defendant as the mastermind, rather than a participant under duress, of Lewis's scheme.

On December 15, 2021, the motion judge rendered a detailed written opinion denying defendant's motion for a new trial. The judge found the federal gang investigation was known to the defense prior to the trial because "authorities had been speaking to [defendant] about his knowledge of the SSC at the time of his arrest . . . [and] later . . . , [defendant] participated in a proffer session [including] with the U.S. Attorney, the Union County Prosecutor, [defendant's attorney], Detective[] Vendas[,]" and others. The judge concluded the defense knew about the federal "investigation into the SSC . . . through [d]efendant's personal experiences." Further, "the [d]efense also had a letter where . . . Williams stated that he had information pertaining to the SSC and argued to the court that . . . Williams may be cooperating with the federal government."

The motion judge found the State did not commit a Brady violation because it was the trial judge who ruled "Williams'[s] federal cooperation was irrelevant and protected" when he reviewed the letters in camera and ex parte. However, "[t]he material's existence, or . . . Williams'[s] cooperation . . . appears never to have been disclosed to the [d]efense." The motion judge found the in

camera review was "problematic" because "it did not result in an order or decision that provided the defense with a general understanding of what was [given to] the trial court or the court's basis for its decision." Furthermore, the trial judge did not review all the letters in the State's possession and did not make a record of the fact there were letters in the State's possession that were not given to the court. The motion judge also found the trial judge's decision "to redact information regarding . . . Williams'[s] federal cooperation, in its entirety, was erroneous" because "the fact of his cooperation in multiple matters was highly probative as to his credibility" by showing "Williams would say anything against anybody to obtain a benefit for himself."

However, the motion judge concluded the withheld evidence "was not material as there is no reasonable probability that the outcome of the trial would have been different if it had been disclosed." The judge noted there was "overwhelming evidence" of defendant's guilt. Moreover, defendant was a "poor" trial witness. His "testimony put him at the heart of the criminal events." Although he "claimed he was intimidated into participating, his actions pre- and post-incident reveal he was not." The judge pointed to the fact defendant did not adhere to Lewis's alleged plan to use a stolen car to commit the crime and instead "abandon[ed] the stolen vehicle, call[ed] . . . Campbell to use her car,

6

expos[ed] her to co-defendant(s), [and then] us[ed] her car . . . ." He also noted even though Worthy left her purse at defendant's apartment, defendant brought it into the stolen car, Torres put a handgun inside it, and after Worthy was killed "[d]efendant then took the purse from Torres (with the gun in it) and gave it to . . . Campbell. This was a purported attempt to discard the gun." Furthermore, the trial evidence showed that "for an individual who was not at the center of the plan, [d]efendant was involved in a number of calls with those involved" the day of the incident.

The judge found defendant's testimony "severely damaged" his credibility because there was no evidence supporting the theory Lewis was a threat to defendant. "Lewis went to work the [day after Worthy's murder] and [d]efendant drove two of the co-defendants back to [their home] after they spent the night at his house." After reviewing the State's cross-examination of defendant, the judge concluded "[t]he idea that [d]efendant was kept alive by a group of hardened killers when he was the only connection to them and the crime defies credulity."

The motion judge pointed out defendant admitted on cross-examination "that he consciously lied to the police in his statement." The State also adduced recordings showing defendant called his girlfriends from jail to find out who

7

had spoken with police when police confronted him with the fact that he gave Worthy's purse to Campbell.

At trial, defendant claimed Lewis had a .357 handgun before Worthy's murder and that after the murder, Lewis took out the weapon placed it on his lap and threatened defendant with it to keep him silent. The motion judge noted the State impeached defendant's credibility when it pointed out for the jury that defendant never mentioned the type of weapon Lewis had until the State's ballistics expert testified .357 caliber bullets were found in Worthy's body. Likewise, for the first time at trial, defendant testified Lewis was friends with the SSC's leader. However, the State impeached his credibility when he admitted during cross-examination that he never previously mentioned the leader of SSC prior to seeing the State's organizational chart bearing the gang leader's name at trial. The State impeached defendant further by pointing out he testified on direct that Harris, Torres, and Lowery were Lewis's friends, yet on cross-examination, he admitted they were his friends through his cousin.

Aside from the evidence of defendant's guilt and impeachment of his credibility, the motion judge also reviewed the letters that were not provided to the trial judge and concluded "they provide[d] only general references to the SSC . . . ." The letters were not dispositive because "[t]he SSC was known to

8

[d]efendant, and he testified about same at trial. Defense counsel closed extensively upon the SSC and its purported influence over [d]efendant." The "[s]ame [was] true for the dangerous propensities the defense attributed to Lewis and him being known to carry a .357 handgun."

The judge concluded "[t]hese arguments were rejected by the jury. Accordingly, the letters themselves would have been of little value at trial."

Defendant raises the following points on appeal:

> POINT I    THE STATE'S <u>BRADY</u> VIOLATIONS REGARDING A KEY WITNESS' MOTIVATION TO TESTIFY AGAINST DEFENDANT AND WHOSE TESTIMONY UNDERMINED DEFENDANT'S DURESS DEFENSE, DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL. IN ADDITION, THE MOTION COURT ERRED IN NOT GRANTING DEFENDANT A NEW TRIAL BASED ON "NEWLY DISCOVERED EVIDENCE" THAT ALSO CONCERNED THIS WITNESS' MOTIVATION TO TESTIFY.
>
>> A.    The Motion Court Erred Because It Did Not Apply The Correct Standard, Whether There Was A "Reasonable Probability" That The Result Of Defendant's Trial Would Have Been Different. Additionally, The Motion Court Should Have Found That The Trial Court's Initial Decision To Withhold <u>Brady</u> Materials Was Wrong.
>>
>> B.    The Withheld <u>Brady</u> Material And The "Newly Discovered Evidence" Was "Favorable" Impeachment Information That Was "Material"

In Defendant's Trial, Warranting A New Trial. This Court Should Reverse The Motion Court's Denial Of A New Trial Because The Court's Factual Findings Were "Clearly Erroneous" And Its Legal Conclusions Were Wrong.

C. Williams'[s] Agreement To Testify, And His Actual Testimony, In Two Federal Cases Was <u>Brady</u> Evidence And "Newly Discovered Evidence" That Warranted A New Trial. The Motion Court's Rejection Based On The Factual Finding That The Federal Cooperation Did Not Relate To His Cooperation In This Case Was "Clearly Erroneous."

D. The Jury's Inconsistent Verdict, Which Was Also Of "Questionable Validity, "Further Demonstrated That The Withheld And Newly Discovered Information Related To Williams'[s] Cooperation Was Material In Defendant's Trial.

E. The Motion Court Should Have Considered All Of The <u>Brady</u> Violations, Including Vendas'[s] Notes, Cumulatively, And Found That A New Trial Was Warranted.

Defendant raises the following points in his pro se brief:

<u>POINT I</u>   THE MOTION COURT IN ITS OPINION ERRED IN DECIDING DEFENDANT'S <u>BRADY</u> CLAIMS FOCUS SOLELY ON WILLIAMS'[S] FEDERAL COOPERATION, AND NEVER CONSIDER[ED] THE ADDITIONAL UNDISCLOSED EVIDENCE FROM WILLIAMS'[S] WRITTEN LETTERS IN ITS <u>BRADY</u> ANALYSIS.

A. The Prosecution Knowingly Allowed Its Key Witness Williams to

10

Falsely Testify. Specifically, Vendas Did Not Make Any Promises to him in Return for his Cooperation Against the Defendant, and Knowingly Allowed This False Testimony to Go Uncorrected in Violation of Defendant's Fourteenth Amendment.

B. The Prosecution Knowingly Withheld Impeachment Evidence of State's Key Witness Williams Attempting to Obtain a Cooperation Agreement to Serve his New Jersey State Sentence Out of State, to be Placed Into the Witness Protection Program, and a Federal Cooperation K1 Letter in Return for his Cooperation Against the Defendant and his Federal Cooperation. In Doing So, the Defendant was Misle[]d During his Cross-Examination of the True Facts and Williams'[s] Motivation in Testifying Against the Defendant Denying the Jury the Right to Make a Fair Evaluation of his Credibility.

C. The Motion Court Erred by Failing to Consider Defendant's <u>Brady</u> Claims Cumulatively Instead of Isolation in Accordance with <u>Kyles v. Whitley</u>, 514 U.S. 419, 441 (1995).

<u>POINT II</u> THE MOTION COURT VIOLATED COURT RULE 2:9-1 BY FAILURE TO COMPLY WITH THE APPELLATE DIVISION DIRECTIVE ON REMAND TO MAKE FINDING OF FACT AND CONCLUSION OF LAW REQUIRED BY COURT <u>RULE</u> 1:7-4 OF AND <u>RULE</u> 3:22-11 IN ACCORDANCE WITH <u>STATE V. CARTER</u>, 85 N.J. 300, 314 (1981); IN DOING SO THE MOTION

11

COURT ERRED IN ITS FINDING OF FACTS THE
WRITTEN LETTERS CONTAINED LITTLE VALUE
DENYING DEFENDANT'S MOTION FOR A NEW
TRIAL.

POINT III DURING THE SEPTEMBER 28, 2012
PROFFER SESSION DONNELLY WAS AN
ASSISTANT PROSECUTOR OF THE UNION
COUNTY PROSECUTOR'S OFFICE WHEN HE
MADE THE PROMISES TO STATE'S KEY
WITNESS . . . WILLIAMS, WHICH IS CONTRARY
TO THE MOTION COURT FACTUAL FINDINGS
OF DONNELLY BEING AN ASSISTANT UNITED
STATES ATTORNEY DURING THE SEPTEMBER
28, 2012 PROFFER SESSION.

I.

A judge's determination whether evidence is subject to disclosure under

Brady presents a mixed question of law and fact. State v. Marshall, 148 N.J. 89,

185 (1997). Under this standard of review, we defer to the judge's supported

factual findings but review de novo the application of legal rules to the factual

findings. State v. Pierre, 223 N.J. 560, 577 (2015).

A Brady violation requires: "(1) the evidence at issue must be favorable

to the accused, either as exculpatory or impeachment evidence; (2) the State

must have suppressed the evidence, either purposely or inadvertently; and (3)

the evidence must be material to the defendant's case." State v. Brown, 236 N.J.

497, 518 (2019). "Nondisclosure of evidence favorable to the accused violates

the constitutional right of due process only 'where the evidence is material to guilt or punishment.'" Carter, 91 N.J. at 112 (quoting Brady, 373 U.S. at 87). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433-34 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682.

"A motion for a new trial upon the ground of newly discovered evidence is not favored and should be granted with caution by a trial court since it disrupts the judicial process." State v. Conway, 193 N.J. Super. 133, 171 (App. Div. 1984) (citing State v. Haines, 20 N.J. 438, 443 (1956)). "[T]he test to be satisfied under a newly discovered evidence approach is more stringent" than a motion for new trial under Brady. Carter, 85 N.J. at 314. A defendant must show the evidence is: "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." Ibid.

"A jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons." State v. Ways, 180 N.J. 171, 187 (2004). Therefore,

"[i]f the undisclosed evidence was merely cumulative or repetitious as to the purpose for which it could have been used, then the verdict need not be reversed." Conway, 193 N.J. Super. at 174 (citing Carter, 85 N.J. at 313).

II.

In point I.A. of his counseled brief, defendant argues the motion judge erred because he failed to assess, as required by Brady, whether the undisclosed letters demonstrated a reasonable probability that the result of defendant's trial would have been different. Instead, defendant argues the judge applied "a harmless error beyond a reasonable doubt standard" because he cited State v. Bass, 224 N.J. 285 (2016).

As we recounted, the motion judge's opinion clearly reflects that he analyzed the undisclosed evidence by applying the Brady materiality standard. The judge found the letters should have been disclosed under Brady, but they were not material because there was no reasonable probability they would have affected the outcome.

The reference to Bass and the harmless error standard related to his finding that the trial judge's decision to redact Williams's federal cooperation was error. The motion judge explained:

> While . . . Williams'[s] presentation is distinct from the defendants in State v. Jackson, 243 N.J. 52 (2020) and

[Bass], as his federal cooperation did not relate to charges against . . . Williams personally, the fact of his cooperation in multiple matters was highly probative as to his credibility.

He then reasoned as follows: "Assuming error in the disclosure of . . . Williams'[s] federal cooperation, the issue becomes whether that error was harmless beyond a reasonable doubt. Bass, 224 N.J. at 307." Notwithstanding the motion judge's analysis of the evidentiary issue, he explained that "given [his] findings regarding the materiality of the information, the question of whether the in-camera process should have been addressed on appeal is moot."

It is clear the motion judge was explaining, from an evidentiary perspective, why the trial judge's in camera redaction was erroneous. The Brady issue and whether it warranted a new trial was an entirely separate analysis.

In this regard, the motion judge examined defendant's arguments by applying the correct legal standard under Carter. Indeed, he found "the information [in Williams's letters] was not material as there is no reasonable probability that the outcome of the trial would have been different if [they] had been disclosed." This was because: the letters made only a general reference to the SSC and MS-13 gangs; and the SSC was known to defendant, he testified about it at trial, and the defense summation addressed the SSC's alleged specter on defendant and the danger posed by Lewis. Furthermore, the record reveals

15

defense counsel questioned Williams extensively about his motive to lie—his desire to exchange his testimony for a better deal for himself—and his prior convictions. For these reasons, the undisclosed letters were cumulative, and the motion judge correctly found they held little value at trial.

## III.

Point I.B. of defendant's counseled brief and, as far as we can glean from points I.B., II., and III. of his pro se brief, challenge the motion judge's factual findings related to the duress defense. He argues the Brady material withheld by the State constituted newly discovered evidence that was favorable to the duress defense and could have been used for impeachment purposes. He claims the judge's finding the letters were cumulative and would have little value at trial was wrong because "defendant's testimony was the primary support of duress and his testimony was not corroborated by another witness." Therefore, the letters would have been valuable corroborative evidence. Defendant also argues the motion judge incorrectly concluded Williams's credibility was sufficiently impeached at trial. He asserts Williams's testimony was the only evidence presented by the State to contradict the duress defense and he should have been able to use his letters to thoroughly impeach Williams. Defendant

16

also asserts the judge made independent factual findings, acted like a thirteenth juror, and failed to follow our remand instructions.

It is clear the jury rejected the duress defense when it found defendant guilty of second-degree robbery, kidnapping, felony murder, and receiving stolen property. As the motion judge noted, there was "overwhelming" evidence of defendant's guilt in the record beyond Williams's testimony to contradict defendant's claim that he was under duress. Indeed, defendant admitted his participation in the crimes and the direct and circumstantial evidence presented by the State and its cross-examination of defendant undermined both his credibility and the theory he participated against his will. The judge's factual findings were derived from the trial transcripts and the evidence he reviewed was the same evidence presented to the jury. That evidence showed the duress defense was contrary to the weight of the evidence.

We reject defendant's argument the undisclosed letters showing Williams's cooperation with federal authorities warrant a new trial. The defense and the jury knew Williams was testifying pursuant to a plea deal. Williams testified he contacted the prosecution to offer his testimony in exchange for a favorable plea deal and he wrote over twenty letters to the prosecutor attempting

17

to negotiate a better deal for himself. Moreover, Williams never spoke to defendant and did not participate in the crime.

During summation, defense counsel argued at length to the jury about why it should not believe Williams, including that his letters were evidence he was motivated to lie to get a lighter sentence and that his testimony "sa[id] nothing." Under these circumstances, the motion judge correctly found Williams's undisclosed letters, which did not contain specific information to support the duress defense or impeachment evidence, but disclosed cooperation with federal authorities, were cumulative and therefore not material Brady evidence.

## IV.

In point I.C. of his counseled brief, defendant contends the motion judge erred because he found Williams's federal cooperation was unrelated to his testimony in defendant's case, and the attempt to draw a connection between the two was "supposition" rather than newly discovered evidence. Defendant argues the matters were related because when Williams was discussing his cooperation in the MS-13 case and attempting to secure federal witness protection, the MS-13 case was still being prosecuted by the Union County Prosecutor's Office, "and there was thus a joint incentive to successfully resolve all three cases in which Williams was ultimately involved."

A-1475-21

The judge did not err. There was no connection between the federal cases and defendant's case. The cases were not factually related and there was insufficient evidence that any of the defendants were members of the SSC. Prior to trial, the State gave the defense an organizational chart of the SSC membership, but Lewis was not listed on the chart. The only evidence defendant offered to support his claim Lewis was a member of the SSC was his own testimony and Williams's testimony from a separate 2016 trial that he heard Lewis was a gang member, but that Lewis "kinda hasn't come out and said it . . . ." Williams said Lewis belonged to a subset of the Bloods gang called "793, also known as the [SSC]." However, defendant testified there was a distinction between 793 and the SSC, and that members of 793 are not necessarily members of the SSC. Moreover, at defendant's trial, Williams was never asked, and in turn did not testify, that Lewis was a member of the SSC. However, Williams did say the SSC had nothing to do with defendant's case, and that a reference to the SSC in one of his letters was "[s]omething completely different."

For these reasons, even if the motion judge's finding the defense argument was supposition was an inaccurate characterization, we are unconvinced the

letters constituted newly discovered evidence because they would not have changed the jury's verdict. The letters were cumulative and were not material.

V.

In point I.D. of his counseled brief, defendant claims the jury's inconsistent verdict is proof the newly discovered information about Williams's federal cooperation was material to his trial. He argues the jury convicted him of second-degree robbery, kidnapping, and felony murder of Worthy, but acquitted him of first-degree robbery, the weapons offenses, and second-degree robbery of Jackson. He claims this verdict shows there were probably jurors who believed he was innocent based on the duress defense and the verdict would have been different if the jury had Williams's letters.

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." State v. Muhammad, 182 N.J. 551, 578 (2005) (quoting State v. Banko, 182 N.J. 44, 53 (2004)). Inconsistent verdicts are permitted "so long as the evidence was sufficient to establish guilt on the substantive offenses beyond a reasonable doubt." State v. Petties, 139 N.J. 310, 319 (1995) (quoting State v. Kamienski, 254 N.J. Super. 75, 95 (App. Div. 1992)). The Supreme Court has instructed us not to "conjecture regarding the nature of the deliberations in the jury room." Muhammad, 182 N.J. at 578

20

(citing State v. Grey, 147 N.J. 4, 11 (1996)).  We do not "speculate whether verdicts resulted from jury lenity, mistake, or compromise . . . ."  Ibid.

The jury verdict was not inconsistent.  Defendant was convicted of the second-degree robbery of Worthy, kidnapping, felony murder, and receiving stolen property.  He was acquitted of the first-degree robbery of Worthy, robbery of Jackson, and weapons offenses.  The verdict shows the jury followed the evidence presented by the State, which showed defendant played a central role in the interactions involving Worthy, whereas Lewis and Lowery were the ones who interacted with Jackson.  Indeed, the jury acquitted defendant of the weapons offenses because there was no evidence he possessed a firearm during the commission of the crimes, and the evidence showed he did not make it to Green Brook to rob Jackson.  While the acquitted offenses could have been convictions if the jury decided defendant was guilty as an accomplice or had constructive possession of the weapon, it is clear the jury exercised its discretion not to make such a finding.

Moreover, as we explained, Williams's letters were not material.  We are unpersuaded that, had they been disclosed, the jury would have acquitted defendant in any respect, because defendant's testimony showed his involvement in each of the crimes of which he was convicted.

A-1475-21

## VI.

In point I.E. of his counseled brief, and point I.C. of his pro se brief, defendant contends the motion judge erred because he failed to consider his claim that the State's delayed production of Detective Vendas's investigatory notes was a Brady violation. In point I.A. of his pro se brief, defendant also contends the judge erred by failing to consider his claim the State suborned perjury and false testimony by allowing Williams to testify that Detective Vendas did not make any promises to him in return for his cooperation against defendant. We decline to consider these arguments because they fall outside the scope of the remand. Moreover, we previously considered and rejected these arguments. Bond II, slip op. at 20-21, 24, 29.

## VII.

Finally, to the extent we have not addressed an argument raised in either the counseled or pro se briefs on appeal, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-1475-21